UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CASHMAN EQUIPMENT CORPORATION          CIVIL ACTION

VERSUS                                 NO: 12-945

SMITH MARINE TOWING                    SECTION: R
CORPORATION


**ORDER AND REASONS**

**I.   INTRODUCTION**

This dispute arises out of unpaid charter hire for the use
of barges owned by Cashman Equipment Corporation and a tugboat
owned by Smith Marine Towing Corporation. Cashman and Smith
Marine have had a business relationship for many years, with
Smith Marine chartering Cashman's barges and Cashman and/or its
affiliate Servicio Marine Superior, LLC chartering Smith Marine's
tugboats. In April 2012, Cashman filed suit against Smith Marine,
seeking outstanding charter hire for its barge, the JMC 2508.[1]
Smith Marine then filed a counterclaim against Cashman and a
third-party complaint against Servicio Marine Superior for
charter fees owed for the M/V Smith Predator tugboat.[2]

On February 25, 2013, the Court conducted a bench trial on
Cashman's and Smith Marine's claims.  The Court has original

_____

[1]     R. Doc. 1.

[2]     R. Doc. 4.

jurisdiction over the claims pursuant to 28 U.S.C. § 1333, as the actions arise from maritime contracts. *See* 28 U.S.C. § 1333 ("The district courts shall have original jurisdiction, exclusive of the courts of the States, of [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."). After hearing live testimony and reviewing all the evidence, the Court rules as follows. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## II.  FINDINGS OF FACT

Cashman Equipment Corporation is a Massachusetts corporation that owns, operates, and charters vessels including barges.[3] Servicio Marine Superior, LLC (SMS) is a Louisiana limited liability company specializing in marine services in Mexico.[4] Smith Marine Towing Corporation is a Louisiana corporation that owns, operates, and charters vessels, primarily tugboats.[5]

---

[3]    R. Doc. 49 at 1 (Joint Stipulations).

[4]    *Id.*

[5]    *Id.*

Cashman and SMS are separate but related entities.[6]  SMS is a manager-managed company, and Cashman serves as the manager.[7] SMS has two members, Kim Shaughnessy, Cashman's chief financial officer, and a trust on behalf of the children of James Cashman, the chief executive officer of Cashman.[8] SMS and Cashman share a mailing address, and a number of employees oversee the affairs of both companies.[9] Cashman's general counsel Andrew Saunders and project manager John Williston testified as to their extensive involvement in SMS's sales, banking operations, and insurance underwriting.[10] The two entities also share a manager for payable and receivable accounts, Carol Gerry.[11] Cashman and SMS have stipulated for the purpose of this litigation that they are jointly liable for any obligations owed to Smith Marine and jointly entitled to recover any obligations owed by Smith Marine.[12]

---

[6]     Testimony of John Williston, Andrew Saunders.

[7]     Testimony of Andrew Saunders.

[8]     *Id.*

[9]     Testimony of Andrew Saunders, John Williston.

[10]    *Id.*

[11]    Cashman Ex. 21.

[12]    R. Doc. 49 at 1.

Between May 2007 and July 2009, SMS chartered Smith Marine's tugs. Two invoices, dating from May 2007 and December 2007, have not been paid in full, with $33,450 outstanding.[13] In February 2009, SMS entered into a charter agreement with Smith Marine for the charter of Smith Marine's tugboat, the MT Smith Predator.[14] The Predator towed a barge for SMS's client, the Mexican company Condux, S.A., DE C.V.[15] SMS and Smith Marine negotiated the terms of the Predator charter orally, after which Smith Marine prepared a one-page customer charter agreement that stated that the day rate for the Predator was $6,300.00, in addition to fees for fuel, lube, and cordage.[16] The charter began on February 9, 2009 without an identified end date.[17] From February to July 2009, Smith Marine sent SMS a series of invoices, which stated as the terms "Net 30 Days."[18] SMS paid $522,400.00 in charter hire and related expenses to Smith for the use of the Predator.[19]

But, SMS encountered payment problems with its client Condux

---

[13]    Smith Marine Ex. 1A, 1B, 18.

[14]    R. Doc. 49 at 2.

[15]    *Id.*

[16]    *Id.; see also* Cashman Ex. 20, p. 2.

[17]    Cashman Ex. 20, p. 2.

[18]    Smith Ex. 1C-O.

[19]    R. Doc. 49 at 2.

in May 2009.[20]   SMS employees asked the captain of the Predator
to halt operations until Condux made a payment, a tactic often
used to force Condux to pay outstanding invoices.[21] Around that
time, Condux's own contract was terminated, leading Condux to
cancel its contract with SMS.[22] Condux's replacement Heerema then
hired SMS.[23] Condux failed to pay its outstanding invoices and
currently owes SMS $3.2 million, which SMS and Cashman have
attempted to recover.[24] After Condux stopped paying SMS, SMS
failed to pay all of the outstanding Smith Marine invoices.[25]
Invoices issued by Smith Marine between February 19, 2009 and
July 15, 2009 for the Predator's charter hire and expenses have
not been paid in full.[26] With the outstanding fees owed for 2007
charter hire, SMS owes Smith Marine $568,292.47 for the use of
its tugs.[27]

　　　In separate transactions, Smith Marine chartered barges from

---

[20]    Testimony of John Williston.

[21]    Cashman Ex. 19.

[22]    Testimony of James Cashman.

[23]    *Id.*

[24]    *Id.*

[25]    *Id.*

[26]    Smith Ex. 1C-O.

[27]    R. Doc. 49 at 2.

Cashman between November 2008 and September 2010.[28] Under the terms of the written charter agreements, Smith Marine owed payment upon receipt of each invoice, and after 15 days, interest would accrue at a rate of one and one-half percent per month on outstanding invoices.[29] During this period, Cashman issued 25 invoices totaling $640,513.72 for Smith Marine's use of the barges.[30] Smith Marine made no payments on the invoices before September 2010.[31] In September 2010, James Cashman and Kirk Smith, the president of Smith Marine, agreed orally that Smith Marine would pay 55 percent of the invoiced amounts.[32] Between September and December 2010, Smith Marine paid $218,766.74 towards six of the invoices issued by Cashman between November 2008 and September 2010 for the use of its barges.[33] As of February 18, 2013, Smith Marine still owed Cashman $421,746.98 in charter hire and related expenses for this period.[34]

In September 2011, Smith Marine bid on a job in Mexico for

---

[28]   R. Doc. 49 at 2.

[29]   *Id.*

[30]   *Id.*

[31]   Testimony of Kirk Smith.

[32]   Testimony of Kirk Smith, James Cashman.

[33]   R. Doc. 49 at 2.

[34]   *Id.*

6

Permaducto SA de CV Av. Preferica,[35] a company with close ties to Condux, although the precise legal relationship between Permaducto and Condux is unknown.[36] Smith Marine entered into a charter for one of its tugs and Cashman's JMC 2508 barge with Permaducto on October 8, 2011.[37] The charter established the day rate for the barge and tug as $10,500,[38] $5,500 for the tug and $5,000 for the barge according to Smith Marine's invoices.[39]

Two days later, Cashman and Smith Marine executed a bareboat charter agreement under which Smith Marine hired the JMC 2508.[40] The charter stated that the fee for the vessel would be "$2,200 per day without set off, beginning on October 11, 2011."[41] The charter established an initial irrevocable term of 30 days, after which the charter would continue until Smith Marine returned the JMC 2508 to Cashman.[42] The agreement provided that, upon expiration of the initial period, Cashman "reserve[d] the right

---

[35]   Testimony of Kirk Smith.

[36]   Testimony of Andrew Saunders.

[37]   Cashman Ex. 17.

[38]   *Id.* at 3.

[39]   Cashman Ex. 18.

[40]   Cashman Ex. 1.

[41]   *Id.* at 1.

[42]   *Id.*

7

to adjust the charter hire rate at [its] sole discretion."[43] The
agreement stated that Cashman would invoice the charter hire and
related costs bi-monthly in advance, with payments due upon
receipt, and that amounts outstanding more than 15 days would
accrue interest at the rate of one and one-half percent per
month.[44] The parties also agreed that Smith Marine would pay for
the cost of surveys conducted by Cashman before and after the
charter to assess the barge's condition.[45]

The charter agreement stated that "Charterer shall not be
permitted to assign this charter or to sub-charter the said
Vessel without the written permission of Owner."[46] The charter
included an integration clause, which stated, "This Agreement . .
. encompasses the entire agreement of the parties, and supersedes
all previous understandings and agreements between the parties,
whether oral or written."[47] The charter also stipulated that
Smith Marine would be responsible for Cashman's costs and
reasonable attorney's fees if litigation resulted from Smith

---

[43]    Cashman Ex. 1.

[44]    *Id.* at 2.

[45]    *Id.*

[46]    *Id.* at 4.

[47]    *Id.* at 5.

Marine's breach of the charter.[48]

Cashman issued its first invoice to Smith Marine on October 11, 2011.[49] After the JMC 2508 left Cashman's fleet, James Cashman called Kirk Smith to confront him about the identity of Smith Marine's client and to demand the return of the barge.[50] On October 14, 2011, Andrew Saunders sent a letter to Smith Marine, stating that Smith Marine's payment was past due and that Smith Marine should immediately return the barge.[51] Smith Marine sent Cashman a check on October 18, 2011 for 55 percent of the invoiced amount.[52] Kirk Smith sent a letter with the check, in which he explained that Smith Marine had held back 45 percent of the owed amount due to his agreement with James Cashman that Smith Marine could set off the charter fees against debts owed by Cashman for earlier charter hire.[53] Cashman issued a second invoice on October 16, 2011, of which Smith Marine again paid a portion.[54]

On October 27, 2011, Cashman wrote to Smith Marine,

---

[48]    *Id.*

[49]    Cashman Ex. 2.

[50]    Testimony of James Cashman, Kirk Smith.

[51]    R. Doc. 49 at 3.

[52]    Smith Marine Ex. 13.

[53]    *Id.*

[54]    R. Doc. 49 at 3.

disagreeing with Smith Marine's assessment of the set off agreement between the parties.[55] Cashman further demanded the return of the JMC 2508 on the grounds that Smith Marine had materially breached the contract and that Smith Marine's use of the barge for its particular client jeopardized Cashman's ability to recoup payments from that client for the earlier job involving the Predator tug.[56] Cashman then sent another letter on November 4, 2011, notifying Smith Marine that the barge's day rate would increase to $5,000 per day after the initial 30 day period expired.[57] Smith Marine was still in the early part of its job in Mexico and did not return the barge.[58]

On November 17, 2011, Cashman again demanded the return of the barge and informed Smith Marine that the rate would increase to $6,000 on December 1, 2011 and thereafter would increase by $1,000 each day that the JMC 2508 remained in Smith Marine's possession.[59] Smith Marine did not return the barge to Cashman until February 2, 2012, 115 days after the charter hire began.[60]

---

[55]   Smith Marine Ex. 16.

[56]   *Id.*

[57]   Cashman Ex. 8.

[58]   Testimony of Kirk Smith.

[59]   Cashman Ex. 10.

[60]   R. Doc. 49 at 4.

During this period, Cashman issued sixteen invoices to Smith Marine for charter hire and expenses, the remaining balance of which totals $2,546,433.53.[61] The parties stipulated that if Cashman is entitled only to charter hire for the JMC 2508 at a rate of $2,200 per day and if Smith Marine is entitled to recover $568,292.47 from Cashman and SMS for the charter of the Predator, the net amount owed by Smith to Cashman and SMS is $81,888.04, exclusive of attorney's fees or interest.[62]

## III. CONCLUSIONS OF LAW

*1. Charter of Smith Marine's tugboat*

The Court first considers Smith Marine's claims against Cashman and SMS for unpaid invoices related to the charter of the Predator. Cashman and SMS acknowledge that Smith Marine has not been paid $568,292.47 in charter fees and expenses that it invoiced. But, Cashman and SMS contend that under the terms of the charter agreement, the payments are not due to Smith Marine, because SMS has not been paid by its client, Condux.

A charter is formed when the parties have a meeting of the minds on the essential terms of the charter. *St. Paul Fire &*

---

[61]   *Id.*

[62]   *Id.*

11

*Marine Ins. Co. v. Vest Transp. Co., Inc.*, 666 F.2d 932, 939 (5th Cir. 1982); *see also E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia*, 673 F. Supp. 796, 799-800 (E.D. La. 1987), *aff'd,* 876 F.2d 1168 (5th Cir. 1989). An oral charter party is valid and enforceable. *St. Paul Fire & Marine Ins. Co*, 666 F.2d at 939. In interpreting a charter, state contract law may be applied to the extent that it does not conflict with admiralty principles. *See Ham Marine, Inc. v. Dresser Indus., Inc.,* 72 F.3d 454, 459 (5th Cir. 1995).

Cashman's witnesses characterized the type of arrangement it had with Smith Marine as "pay if paid" or "pay when paid" and testified that this fee structure is common for projects done in Mexico, since clients often do not pay promptly.[63] Cashman and SMS argue that the payment structure constituted a suspensive condition of a contract, and thus payment is not due until the uncertain event, payment by SMS's client, occurs. *See* La. Civ. Code. art. 1767 ("If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.").

In *Southern States Masonry, Inc. v. J.A. Jones Construction Company*, the Louisiana Supreme Court heard an appeal in which a contractor claimed that he need not pay the subcontractor until

---

[63]     Testimony of James Cashman, John Williston.

he received payment from the project owner, since the subcontract contained a conditional fee arrangement. 507 So.2d 198 (La. 1987). The subcontract stated that the "contractor shall pay to subcontractor, upon receipt of payment from the owner, an amount equal to the value of subcontractor's completed work." *Id.* at 200. It also stated that final payment would occur within 45 days of the last of the following to occur: the subcontractor's completion of work, the owner's acceptance of work, or "final payment by owner to contractor under the contract." *Id.* The Louisiana Supreme Court held that because it was reasonably certain that the owner would pay the contractor in the manner set forth in their contract, the fee arrangement between the subcontractor and contractor constituted a term rather than a suspensive condition. *Id.* at 203. The court determined that the contract at issue left open the time at which the subcontractor would be paid, not whether the subcontractor would be paid at all. *Id.* at 204. Further, the court held that as a contract term, payment needed to be made within a reasonable amount of time. *Id.* (citing La. Civ. Code Ann. art. 1778 ("A term for the performance of an obligation . . . is uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time)).

 The Court finds that the holding of *Southern States*

establishes an important distinction between "pay if paid" and "pay when paid" fee structures. Kirk Smith testified that he never agreed to an arrangement under which he would not be paid if SMS did not receive payment.[64]  Although Smith Marine's invoices for the Predator stated as a payment term "Net 30 days," Smith testified that he knew that payment might be delayed due to the clients involved.[65] Smith insisted, however, that he fully expected to receive the charter fees from SMS eventually and did not intend to assume the risk that he would not be paid.[66] Smith's testimony reveals his understanding of the arrangement to be "pay when paid" as set forth in *Southern States Masonry*, rather than "pay if paid".

In defending their interpretation of the payment structure, Cashman and SMS point to cases in which courts accepted as valid conditional payment arrangements, the "pay if paid" model. *See Imagine Const., Inc. v. Centex Landis Constr. Co., Inc.,* 707 So.2d 500, 502 (La. Ct. App. 1998); *C. Bel for Awnings, Inc. v. Blaine-Hays Const. Co.*, 532 So.2d 830, 831 (La. Ct. App. 1988). But, in *Imagine Construction*, for example, the contract explicitly stated that the subcontractor "shall not be entitled

---

[64]     Testimony of Kirk Smith.

[65]     *Id.*

[66]     *Id.*

to receive any progress payment or final payment prior to Centex
Landis' actual receipt of that payment from Owner." 707 So. 2d at
502. Further, the owner's payment to the contractor was labeled a
condition precedent to an action by the subcontractor for failure
to pay. *Id.; see also Bel for Awnings, Inc*, 532 So.2d at 832
(contract stated that subcontractor was not entitled to receive
payment from contractor until the owner paid contractor).

Under Louisiana law, the party relying on a suspensive
condition must prove the existence of the condition. *See Sam's
Style Shop v. Cosmos Broad. Corp.,* 694 F.2d 998, 1004 (5th Cir.
1982). Moreover, Louisiana courts avoid construing contractual
provisions as suspensive conditions whenever possible. *See
Mumblow v. Monroe Broadcasting*, 401 F.3d 616, 622 (5th Cir.
2005). Here, Cashman and SMS have not demonstrated that the
charter of the Predator included an explicit provision that Smith
Marine would not be paid until SMS received payment. There is no
such provision in any document, and Kirk Smith denied that he
made such an agreement.[67] Further, Smith Marine's witness Brian
Jones, a former Cashman employee who represented Cashman in the
charter of the Predator, testified that he did not have a
specific discussion with Kirk Smith about a "pay if paid" fee

---

[67]    Testimony of Kirk Smith.

arrangement.[68] Testimony by Cashman's witnesses that such payment arrangements were common falls far short of establishing that payments for the Predator depended on SMS's payment by its client. Further, the Court finds to be unsubstantiated James Cashman's testimony that Smith Marine received a high charter rate for the Predator based on the uncertainty involved in working in Mexico.[69] John Williston testified that the usual rate for the tug was $5,000 - $6,000,[70] which does not demonstrate conclusively that the rate of $6,300 that Smith Marine received reflected the risk of nonpayment rather than a delay in payment or other unidentified conditions.

Cashman and SMS also point to emails sent by Smith Marine in October 2009 in which Smith Marine asked when SMS expected to be paid by its client.[71] Cashman and SMS argue that Smith Marine acknowledged the "pay if paid" fee arrangement through this correspondence. But, these emails demonstrate only Smith Marine's efforts to be paid and do not establish that the parties agreed to a suspensive condition as their payment arrangement in which Smith Marine knowingly assumed the risk that it might not be paid

---

[68]    Testimony of Brian Jones.

[69]    Testimony of James Cashman.

[70]    Testimony of John Williston.

[71]    Cashman Ex. 21, p. 3.

at all for the charter of its tug.

Accordingly, in considering the testimony and applicable Louisiana state law, the Court finds that the parties did not agree to a "pay if paid" fee agreement for the charter of the Predator. Rather, the parties had an understanding that payment to Smith Marine might be delayed if SMS's client did not timely pay.[72] Therefore, the uncertainty as to the exact date of payment constituted a contract term, which must be performed within a reasonable amount of time. *See* La. Civ. Code Ann. art. 1778.

Smith Marine issued its last invoice for the Predator on July 15, 2009 and thus has waited over three years for payment of the charter hire.[73] The Court finds that such a delay does not comport with the requirement of Louisiana Civil Code art. 1778 that an uncertain term be performed within a reasonable time period. Cashman and SMS therefore breached the terms of the charter for the Predator tug by failing to pay Smith Marine within a reasonable amount of time. The Court finds that charter hire for the Predator tug is presently due and that Cashman and SMS jointly owe Smith Marine $568,292.47 in charter fees and expenses.

---

[72]    *See, e.g.,* Testimony of John Williston (testifying that under the terms of the agreement, payment "could take a while").

[73]    Smith Marine Ex. 1-O.

17

Prejudgment interest is generally awarded in admiralty cases unless there are "peculiar circumstances" making it inequitable for the losing party to pay prejudgment interest. *Noritake Co., Inc. v. M/V Hellenic Champion,* 627 F.2d 724, 728 (5th Cir. 1980). It is within the court's discretion to determine the rate of prejudgment interest. *See In re Int'l Marine, LLC*, 614 F. Supp. 2d 733, 741 (E.D. La. 2009). The Fifth Circuit has upheld awards at the Louisiana legal rate, the federal legal rate, and a number of other rates. *See Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F. Supp. 738, 770-71 (E.D. La. 1989), *aff'd and remanded*, 904 F.2d 317 (5th Cir. 1990). The court also has discretion to determine the date at which prejudgment interest accrues, *see In re Int'l Marine, LLC*, 614 F. Supp. at 741, and generally awards interest from the date of loss, *see Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986); *Sea Link Serv. Inc., v. Marine Centre Inc.*, 380 Fed. Appx. 460 (5th Cir. 2010) (stating that prejudgment interest should run from date of injury in suit to recover unpaid charter fees).

Here, Smith Marine requests prejudgment interest but has submitted no conclusions of law or proposed findings of fact as to the date from which interest should run. Although the invoices issued for the Predator stated that payment was due "Net 30 days," Kirk Smith acknowledged that he expected payment to be

18

delayed. Smith Marine therefore did not consider SMS to be in immediate breach of the charter upon SMS's initial failure to pay the Predator invoices. But, emails sent by Smith Marine employees demonstrate that Smith Marine actively sought payment on the invoices by October 2009.[74]  In fact, Kirk Smith even offered SMS a discount on the invoices so that he might collect some of the funds owed.[75] The Court finds that by October 2009, Smith Marine treated the Predator charter fees as due. Moreover, the Court finds that SMS's failure to make payments on the Predator invoices within three months after it stopped using the Predator is unreasonable and a breach of the charter agreement. The Court therefore finds that Smith Marine's injury occurred 90 days after Smith Marine issued the last invoice for the Predator, on July 15, 2009. Accordingly, the Court finds that SMS and/or Cashman owe prejudgment interest from October 15, 2009.

As to the rate of interest, neither Smith Marine's customer charter agreement for the Predator nor its invoices included an interest rate for late payments. But, the charters executed by Cashman and Smith Marine between 2008 and 2010 for the charter of Cashman's barges stated that invoices outstanding more than 15 days would accrue interest at a rate of one and one-half percent

---

[74]    Smith Marine Ex. 2.

[75]    *Id.*; Testimony of Kirk Smith.

per month.[76] In the absence of other evidence submitted by Smith Marine as to the appropriate rate for prejudgment interest, the Court finds that the interest rate agreed upon by the parties for the Cashman barges reflects a reasonable interest rate for vessel charter hire during the period in which the Predator was hired. Therefore, the Court determines that SMS and/or Cashman owe to Smith Marine prejudgment interest at a rate of one and one-half percent per month on the total of $568,292.47, running from October 15, 2009.

  B. *Charter of Cashman's barges between 2008-2010*

The second dispute among the parties concerns Smith Marine's charter of Cashman's barges between 2008-2010. During this period Cashman issued 25 invoices totaling $640,513.72 between November 2008 and October 2010.[77] As of September 2010, Smith Marine had made no payments on the invoices.[78] That month, James Cashman and Kirk Smith agreed that Smith Marine would pay 55 percent of the outstanding invoices.[79] Between September 20, 2010 and December

---

[76]   R. Doc. 49 at 2.

[77]   *Id.;* Smith Marine Ex. 19.

[78]   Testimony of Kirk Smith.

[79]   *Id.*

23, 2010, Smith Marine paid $218,766.74 towards six of the invoices and then made no further payments.[80]

The parties dispute the financial arrangement reached by James Cashman and Kirk Smith, namely whether the 45 percent of the invoices that Smith Marine did not pay was set off against the outstanding amount that SMS owed to Smith Marine for the charter of the Predator. James Cashman testified that he agreed to let Smith Marine pay a portion of the outstanding invoices for a period of no more than six months, until Smith Marine's finances improved and it could make the full payments.[81] Cashman denied that the percentage that Smith Marine did not pay was set off against the fees owed on the Predator, since SMS, not Cashman, owed the Predator charter hire.[82]   Conversely, Kirk Smith testified that according to his agreement with Cashman, Smith Marine would keep chartering barges and the 45 percent that it held back would be applied to the charter fees owed on the Predator.[83]

The Court finds that the evidence fails to demonstrate that James Cashman and Kirk Smith agreed that the 45 percent of the

---

[80]   R. Doc. 49 at 2.

[81]   Testimony of James Cashman.

[82]   *Id.*

[83]   Testimony of Kirk Smith.

invoiced total that Smith Marine did not pay would be applied to the Predator charter hire. First, there are no contemporaneous financial records from either company that show that the unpaid 45 percent was set off against the Predator invoices. Ricky Leblanc, a certified public accountant who created financial statements for Smith Marine, testified that Smith Marine's internal records reduced the $568,292.47 owed for the Predator by the amount held back from the payments on the Cashman barges.[84] But, he acknowledged that the account receivable reports sent to Cashman did not reflect this reduction.[85]   Second, James Cashman was credible in his denial of such an agreement.[86] Third, SMS owed Smith Marine for the charter hire, not Cashman. Accordingly, the Court finds that Smith Marine has failed to demonstrate that a meeting of the minds occurred between James Cashman and Kirk Smith as to a set off of a portion of the Cashman barge invoices against Smith Marine's Predator invoices. At most, the evidence supports an agreement to accept 55% of the amounts due Cashman as an accommodation to Smith Marine for a temporary period.

In any event, Smith Marine failed to pay 55% of all the invoices. No further payments were made on the outstanding barge

---

[84]     Testimony of Ricky Leblanc.

[85]     *Id.*

[86]     Testimony of James Cashman.

fees after December 23, 2010.[87] By that date, Smith Marine had paid 55 percent of 19 of the 25 invoices.[88] By failing to make any additional payments on the barge invoices, Smith Marine breached its agreement with Cashman. Smith Marine accordingly owes Cashman $421,746.98 on outstanding invoices issued years ago.

The Court finds that Cashman is entitled to prejudgment interest as the result of this failure to timely pay charter hire.  But, Cashman did not submit to the Court any evidence by which to compute the prejudgment interest. Therefore, the Court will apply the metric used above, under which Smith Marine owes prejudgment interest at the rate of one and one half percent per month, the rate identified in the barge charters.[89]

As for the date of loss, although the Cashman barge charters required payment upon receipt of the invoices,[90] there is no evidence in the record that Cashman sought payment on the invoices until the conversation between James Cashman and Kirk Smith in September 2010. Cashman then agreed to permit Smith Marine to make 55 percent payments on outstanding invoices. SMS

---

[87]    R. Doc. 49 at 2.

[88]    *Id.*

[89]    *Id.*

[90]    Smith Marine Ex. 3-5.

23

did so from September 2010 until December 2010, and then it
stopped all payments. The Court therefore finds that the
appropriate date of loss is December 23, 2010, the day on which
Smith Marine failed to abide by its agreement to pay 55 percent
of the invoices. Thus, the Court finds that Cashman is owed
prejudgment interest on the sum of $421,746.98, running from
December 23, 2010.

    C. Charter of JMC 2508

    The remaining fees at issue are those owed by Smith Marine
for the charter of Cashman's barge, the JMC 2508. Cashman and
Smith Marine executed a written charter party for the barge on
October 10, 2011. The charter states that controversies that
arise shall be governed by general maritime law, insofar as
applicable, and otherwise by Louisiana law.[91] In their
conclusions of law, the parties relied primarily on cases
involving Louisiana law. Under either maritime or Louisiana law,
"a court may not look beyond the written language of the document
to determine the intent of the parties unless the disputed
contract provision is ambiguous." *Corbitt v. Diamond Drilling
Co.,* 654 F.2d 329, 333-34 (5th Cir. 1981); *see also Ortega v.
State, Dept. of Transp. and Development,* 689 So.2d 1358,

---

[91]    Cashman Ex. 1, p. 5.

1363–1364 (La. 1997) ("The meaning and intent of the parties to a written instrument, including a compromise, is ordinarily determined from the instrument's four corners."); La. Civ. Code Ann. art 2046 ("When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.").

    1. Material Breach of Charter

    Cashman contends that Smith Marine materially breached the terms of the charter by subchartering the JMC 2508 barge to Permaducto and by failing to timely pay charter fees. The charter party states that "Charterer shall not be permitted to assign this charter or to sub-charter the said Vessel without the written permission of Owner."[92] James Cashman testified that, although his company did not enforce the requirement that it be notified of subcharters in writing, Cashman always knew the identity of the companies subchartering its barges.[93] James Cashman and Andrew Saunders testified that Cashman would not have chartered the JMC 2508 to Smith Marine had it known the identity of Smith Marine's client, since Cashman was attempting to put pressure on Permaducto's affiliate, Condux, to recover funds owed

---

[92]    Cashman Ex. 1, p.4.

[93]    Testimony of James Cashman.

25

for the job involving the Predator.[94] In fact, James Cashman testified that upon hearing rumors that Smith Marine was working for a company linked to Condux, he called Kirk Smith, who assured him that the subcharterer of the JMC 2508 was Global Industries, an American company.[95] James Cashman testified that after his company and Smith Marine executed the JMC 2508 charter and it left port, he learned the real identity of Smith Marine's client.[96] Cashman's witnesses insisted that Kirk Smith knew of Cashman's efforts to recoup outstanding fees from Condux and its unwillingness to provide barges to the company until Condux paid the fees.[97]

Conversely, Kirk Smith testified that he informed Cashman through its employee Dickie Tolbert about his need for a barge in Mexico.[98] He testified that he never discussed with James Cashman the clients for which Smith Marine could work using Cashman barges.[99] Smith also testified that he never told anyone that his client was Global Industries and that the conversation in which

---

[94]   Testimony of James Cashman, Andrew Saunders.

[95]   Testimony of James Cashman.

[96]   *Id.*

[97]   Testimony of James Cashman, John Williston.

[98]   Testimony of Kirk Smith.

[99]   *Id.*

26

James Cashman expressed his anger with Smith Marine's client occurred after the charter with Permaducto had begun.[100] In addition, Smith disagreed with Cashman's interpretation of the subcharter clause of the JMC 2508 charter. Smith testified that due to the nature of the Smith Marine-Permaducto arrangement as a time charter, Permaducto merely rented use of the JMC 2508 barge.[101] Smith Marine remained liable for the barge, and it was accompanied by Smith Marine's tug, which Smith Marine employees manned at all times.[102] Therefore, according to Smith, Smith Marine's transaction with Permaducto did not qualify as a subcharter under the terms of the JMC 2508 charter, and Smith Marine did not need to obtain Cashman's permission to enter a time charter with Permaducto.

The Court finds that the plain language of the JMC 2508 charter does not support Smith Marine's contention that its charter of the barge to Permaducto does not qualify as a sub-charter. The provision states that the charterer may not assign the charter or subcharter the vessel without written permission. The two primary types of charter arrangements are a bareboat charter, in which the charterer gains full possession of the

---

[100]   Testimony of Kirk Smith.

[101]   *Id.*

[102]   *Id.*

27

vessel, and a time charter, in which the owner maintains possession and control. *See Walker v. Braus*, 995 F.2d 77, 81 (5th Cir. 1993). The provision in the JMC 2508 charter states only that a subcharter without permission is not permitted, and it does not identify a particular type of charter.[103] The Court therefore finds that Smith Marine's time charter of the JMC 2508 to Permaducto qualifies as a subcharter under the terms of the charter executed by Cashman and Smith Marine.

Although the testimony conflicts as to whether discussions took place about the identity of Smith Marine's client before the JMC 2508 left port, and the Court finds Kirk Smith's version to be more credible, it is nevertheless undisputed that Smith Marine did not seek Cashman's permission to subcharter the JMC 2508 to Permaducto. The terms of the JMC 2508 charter clearly state that such permission is required, and Cashman's witnesses testified that the company always wants to know the end clients that its barges will serve.[104] By the terms of the JMC 2508 charter, Smith Marine's subcontract of the barge to Permaducto without permission constituted a breach of the charter.

Smith Marine's breach gave Cashman the right to terminate the charter, which Cashman did when it demanded that Smith Marine

---

[103]   Cashman Ex. 1, p.4.

[104]   Testimony of James Cashman, Andrew Saunders.

28

return the barge. Under admiralty law, if a breach of a charter
is material in that it impacts the essence of the agreement,
there may be a right to dissolve the charter. *See* Thomas J.
Schoenbaum, 2 *Admiralty & Mar. Law* § 11-17 (5th ed.); *see also*
La. Rev. Stat. art. 2013 ("When the obligor fails to perform, the
obligee has a right to the judicial dissolution of the contract
or, according to the circumstances, to regard the contract as
dissolved.").

James Cashman testified that after learning that Smith
Marine had contracted with Permaducto, he called Kirk Smith and
demanded that he return the vessel.[105] Cashman then asked Andrew
Saunders to draft a letter, enumerating Smith Marine's violations
of the charter and requiring that the barge be sent back.[106]
Saunders sent a letter on October 14, 2011 in which he declared
Smith Marine to be in material breach of the charter agreement
and demanded the immediate return of the barge.[107] In a letter
sent on October 27, 2011, Saunders stated that Smith Marine's use
of the JMC 2508 jeopardized Cashman's ability to collect amounts

---

[105]   Testimony of James Cashman.

[106]   *Id.*

[107]   Smith Ex. 12; Testimony of Andrew Saunders.

29

owed, and he again demanded the immediate return of the barge.[108] Letters sent on November 4, 2011 and November 17, 2011 repeated the demand that the vessel be returned.[109] When asked during his testimony whether his actions terminated the charter, Cashman emphasized that he wanted the JMC 2508 returned.[110] The Court finds that through the multiple demands made by Cashman and Saunders, Cashman terminated the charter by revoking Smith Marine's right to possess the barge and to carry out its obligations under the charter.

Further, the Court finds that Cashman acted within its rights in terminating the charter when Smith Marine breached it by subchartering to Permaducto without permission. The Court finds that Smith Marine's unauthorized subcharter of the barge affected the essence of the agreement, in that it impacted the way in which the barge would be used and for whom. Andrew Saunders testified that Cashman always wished to know the identity of clients to avoid situations such as fees owed by judgment-proof clients.[111]  Knowledge of the client permitted Cashman to protect its interests, and thus subchartering the

---

[108]    Smith Ex. 16.

[109]    Cashman Ex. 8, 10,

[110]    Testimony of

[111]    Testimony of Andrew Saunders.

barge without permission represented a material breach of the JMC 2508 charter. *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Care Flight Air Ambulance Serv., Inc.*, No. 3:91-CV-1187-H, 1992 WL 613254, at *6 (N.D. Tex. Nov. 2, 1992) (defendant's sublease of aircraft without permission constituted a material breach of the lease). The Court thus finds that Cashman was entitled to terminate the charter, which it effected by demanding the return of the vessel and ending Smith Marine's right to possess it.[112]

### 2. Damages

Damages for breach of contract are measured as just compensation for losses actually sustained as a result of the breach and "are meant to restore the injured party to the position he would have occupied had the breaching party performed the contract." *ARV Offshore Co., Ltd. v. Con-Dive, L.L.C.*, No. 12-20098, 2013 WL 657782, at *3 (5th Cir. Feb. 22, 2013); Thomas J. Schoenbaum, 2 *Admiralty & Mar. Law* 11-17 (5th ed.) (measure of damages for breach of charter party based on recoverable damages for breach of contract).

---

[112] Because the Court finds that Smith Marine's unauthorized subcharter of the JMC 2508 to Permaducto violated the terms of the charter, the Court need not determine whether Smith Marine's partial payments of the charter hire for the JMC 2508 as a set off also constituted a breach of the charter agreement.

Cashman seeks damages of $2,546,433.53 for Smith Marine's breach of the charter agreement.[113] This figure reflects Cashman's increase of the daily charter rate from $2,200 to $69,000 during the 115 days in which the Smith Marine had possession of the JMC 2508.[114] The damages inquiry seeks to determine the amount required to place Cashman in the position it would have occupied had Smith Marine performed as anticipated. The parties presented conflicting testimony as to whether Cashman could increase unconditionally the charter rate under the terms of the charter after the initial 30-day period. Kirk Smith testified that he has never experienced a similar rate increase on a vessel and that the clause permitting Cashman to adjust the rate is common in charter agreements as a means of allowing for changing market conditions during a long-term charter.[115] There is no evidence that Cashman would have increased the charter rate after the initial 30 day period had the charter proceeded as planned.

In fact, Cashman and Smith Marine executed a charter agreement on November 19, 2011, which set the daily rate for use

---

[113]   Cashman's issued 16 invoices for charter fees and expenses, which totaled $2,571,843.53. Smith Marine paid a portion of the first two invoices. R. Doc. 49 at 4.

[114]   Cashman Ex. 11.

[115]   Testimony of Kirk Smith.

of another of Cashman's barge at $2,200 per day.[116] The parties executed this charter after Cashman sent letters to Smith Marine raising the rate of hire on the JMC 2508. The subsequent charter demonstrates that the increase demanded by Cashman did not reflect any increase in the market rate of hire. The steady charter rate of $2,200 for Cashman's barges negates claims made by Cashman employees that it would have raised the rates for the JMC 2508 under normal circumstances or charged higher rates to another client.

Moreover, the Court finds that the charter agreement did not permit Cashman to double the rate of hire, let alone raise it to $69,000, given the use of the word "adjust" rather than "increase". The word "adjust" is defined as "to change so as to fit, conform, make suitable" and "to make accurate by regulating." *Webster's New World College Dictionary* (4th ed.). The Court finds that Cashman's interpretation of the word "adjust" as permitting it to raise the daily rate of hire willy nilly from $2,200 to $69,000 in less than four months is unreasonable. *See, e.g., Henry's Marine Serv., Inc. v. Fireman's Fund Ins. Co.*, 193 F. App'x 267, 277 (5th Cir. 2006) (affirming district court's decision that defendant offered no reasonable

---

[116]    Smith Marine Ex. 22.

explanation as to the coverage provided by a contract term). The Court thus interprets the phrase at issue as allowing Cashman to increase the rate of hire if market circumstances so demand. The Court finds that Cashman has put forth no evidence that conditions regarding barge charters changed during the period in which Smith Marine had control of the JMC 2508. In arguing that Smith Marine should pay charter hire for the barge at the rate of at least $5,000 per day, Cashman points to Smith Marine's subcharter of the JMC 2508 to Permaducto at the rate of $5,000 per day.[117] But, Smith Marine and Permaducto negotiated this rate on October 8, 2011, before Cashman set the charter rate for the JMC 2508 at $2,200. Thus, the Court finds that the rate charged to Permaducto has no bearing on the charter hire that Cashman would have charged for the JMC 2508 had the charter to Smith Marine progressed past 30 days as anticipated.

Accordingly, the Court finds that to restore Cashman to the position it would have occupied had Smith Marine not breached the charter requires Smith Marine to pay damages in the amount of **$228,433.53**. The Court arrives at this figure based on the contractual rate of charter hire that the parties agreed upon, $2,200, for the 115 days that Smith Marine possessed the JMC

---

[117]   Cashman Ex. 18.

2508. The total reflects the $25,410 in charter hire that Smith Marine has already paid to Cashman and includes $843.53 in charges for surveys conducted pursuant to the charter.[118]

Moreover, the Court finds that Smith Marine is required to pay litigation costs and reasonable attorney's fees incurred by Cashman in litigating issues related to the breach of the JMC 2508 charter. Under both admiralty and Louisiana law, attorney's fees generally are not due to a successful litigant unless specifically provided for by contract or statute. *See Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 405 (5th Cir. 2003); *Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc.,* 449 So.2d 1014, 1015 (La. 1984). The charter agreement for the JMC 2508 states:

> The Charterer further agrees that in the event of any legal action or arbitration arising out of or as a result of Charterer's breach or default of any of the provisions and covenants of this charter, that said Charterer shall pay reasonable attorney's fees incurred by Owner and all costs involved therein.[119]

The Court has found that Smith Marine breached the charter. Therefore, by the terms of the charter, Smith Marine owes to Cashman litigation costs and reasonable attorney's fees expended in litigating claims related to the charter of the JMC 2508.

---

[118]   R. Docs. 49 at 3-4; 56 at 9.

[119]   Cashman Ex. 1.

To calculate reasonable attorney's fees, the Fifth Circuit
uses the "lodestar" method, which involves multiplying the number
of hours spent by a reasonable hourly rate for such work in the
community. *Heidtman v. County of El Paso,* 171 F.3d 1038, 1043
(5th Cir. 1999). A court may then enhance or decrease the
lodestar based on the twelve factors set out in *Johnson v.
Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir.
1974). Cashman has not provided the Court with any information
with which to calculate reasonable attorney's fees and costs in
this matter. The Court orders Cashman to submit within ten days
of entry of the Court's judgment a sworn application for
attorney's fees that specifies the hours worked, the hourly rates
paid, and addresses the applicable *Johnson* factors. *See Doctor's
Associates, Inc. v. Vinnie's Smokehouse/Meat Specialty, LLC*, No.
10-3661, 2011 WL 1226485 (E.D. La. Mar. 29, 2011) (requiring
plaintiff to submit evidence so that attorney's fees could be
calculated).

The Court also finds that Cashman is entitled to prejudgment
interest on the damages owed for breach of the JMC 2508 charter.
As previously stated, prejudgment interest is generally awarded
in admiralty cases absent "peculiar circumstances" making it
inequitable for the losing party to pay prejudgment interest.
*Noritake Co., Inc.,* 627 F.2d at 728. No evidence has been put

36

forth of any such peculiar circumstances here. Therefore, Smith Marine must pay to Cashman prejudgment interest at the rate of one and one-half percent per month, the rate identified by the parties in the JMC 2508 charter agreement for untimely payments. *See, e.g., Otto Candies, Inc. v. McDermott Int'l, Inc.*, 600 F. Supp. 1334, 1345 (E.D. La. 1985) *aff'd sub nom. Otto Candies v. McDermott Int'l*, 785 F.2d 1033 (5th Cir. 1986).

Interest generally runs from the date of loss. *See Reeled Tubing, Inc.*, 794 F.2d at 1029. The Court has found that Smith Marine materially breached the JMC 2508 charter through its subcharter of the vessel without Cashman's permission. The Court thus finds that it is appropriate to set as the date of loss October 27, 2011, when Cashman demanded the return of the JMC 2508 and informed Smith Marine that its use of the barge for Permaducto jeopardized Cashman's ability to recoup owed fees. By this date, Cashman had already written to Smith Marine once, requiring Smith Marine to return the barge but failing to mention the issue of Smith Marine's client. The Court therefore finds that Cashman's loss occurred the day on which it demanded to no avail the return of the JMC 2508 to protect its leverage against Permaducto and/or Condux.

Yet, on October 27, 2011, Cashman's damages had not yet reached the total amount identified by the Court. The Court

37

therefore finds that Smith Marine owes prejudgment interest on
the invoiced amounts running from October 27, 2011, with the
total amount on which the interest is calculated reflecting the
partial payments by Smith Marine and the Court's determination
that damages should be based on the charter hire rate of $2200
throughout the period during which Smith Marine was in possession
of the JMC 2508.

**IV.   CONCLUSION**

    The Court notes that these parties have a long history of
business dealings that was often informal and that involved
departures from the terms of written agreements to accommodate
one another. Unfortunately, that course of dealing broke down in
this case. The Court has endeavored to interpret the parties'
agreements in a manner consistent with the arrangements they
reached throughout their extensive interactions.

    For the foregoing reasons, it is the judgment of this Court
that Cashman and SMS together owe **$568,292.47** to Smith Marine in
outstanding charter fees for the Predator tug, with prejudgment
interest at the rate of one and one half percent to run from
October 15, 2009. Smith Marine owes to Cashman and SMS
**$421,746.98** for barge hire between 2008 and 2010, in addition to
prejudgment interest at the rate of one and one half percent to

run from December 23, 2010. Smith Marine also owes to Cashman and SMS **$228,433.53** in damages for breach of the JMC 2508 charter agreement, in addition to costs, reasonable attorney's fees, and prejudgment interest on the invoiced amounts to run from October 27, 2011 at the rate of one and one half percent per month. The Court orders Cashman to submit within ten days of entry of this order a sworn application for attorney's fees that specifies the hours worked, the hourly rates paid, and addresses the applicable *Johnson* factors. The Court will withhold final judgment until the amount of the attorney's fees and litigation costs is resolved.

New Orleans, Louisiana, this 12th day of April, 2013.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE